**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| MEGAN MARIE DELANEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3086 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Megan Marie Delaney appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Delaney filed a Motion for Summary Judgment (d/e 13).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  The parties consented to proceed before this Court. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order entered May 18, 2017 (d/e 9)</u>.  For the reasons set forth below, the decision of the Defendant Commissioner is AFFIRMED.

Delaney was born November 3, 1986.  She completed about two years of college.  She previously worked as a school bus monitor, general farm worker, and food service manager.  She last worked in June 2012 at a Dollar General store as a cashier.  Delaney suffers from type 1 insulin dependent diabetes, diabetic neuropathy, diabetic retinopathy, affective disorder, and anxiety.  Certified Transcript of Proceedings before the Social Security Administration (d/e 11) (R.), 17, 28, 44, 705.

On April 28, 2012, Delaney went to the emergency room at Memorial Hospital in Taylorville, Illinois (Taylorville Hospital).  Delaney had multiple skin infections.  The emergency room physician noted, "She states that her sugars have been 200+ recently and she is not really following a diet or doing what she is supposed to do although she does seem to know the risks."  The physician "spent a significant amount of time discussing the risks of diabetes and encouraging her to follow the appropriate diet." R. 551.  The emergency room physician prescribed antibiotics for her infections, encouraged her to follow an appropriate diabetic regimen, and discharged her.  R. 552.

On May 16, 2012 Delaney was admitted to St. John's Hospital in Springfield, Illinois (St. John's).  Delaney did not know the insulin dose

prescribed to her.   Over the next two days, the doctors adjusted her insulin dose until she had a consistent blood sugar reading under 200 with not low blood sugar events.  She was discharged on May 19, 2012.  R. 614-15.

On May 29, 2012, Delaney went to St. John's, but left against medical advice.  R. 640.  On May 30, 2012, Delaney went to the emergency room at Taylorville Hospital with low blood sugar.  She was given Glucagon and transferred to St. John's Hospital for observation and continued monitoring of her blood sugar.  R. 544.  She was admitted to St. John's and discharged on June 2, 2012 with a diabetic diet and a prescription for insulin.  R. 640.

On June 22, 2012, Delaney went to the emergency room at Taylorville Hospital with low blood sugar.  Her diabetes was poorly controlled.  She had not eaten that day and collapsed.  She was given dextrose and became awake and alert.  R. 543.

On January 25, 2013, Delaney saw Dr. Zulfiqar Hashim, M.D., for diabetic neuropathy.  R. 833-35.  Delaney reported "pins and needle" sensations in her lower extremities.  On examination, Delaney was negative for dizziness, extremity weakness, headache, numbness in extremities, and tremors.  Delaney also showed no loss of light touch and

vibration sensation in her lower extremities. R. 835. Dr. Hashim prescribed Neurontin (gabapentin). R. 833.

On May 17, 2013, Delaney saw Dr. Madhumita Banga, M.D., for a follow up on her diabetes. R. 830-32. Her diabetes was uncontrolled at the time. The Neurontin was not fully controlling her neuropathy. Dr. Banga advised her that strict glycemic control was necessary for neuropathy pain control. R. 830.

On July 20, 2013, Delaney went to America's Best Contacts & Eyeglasses for an eye examination. R. 605-06. Her corrected visual acuity was 20/40 in the right eye and 20/70 in the left. The optometrist referred Delaney to a retina specialist. R. 606.

On September 27, 2013, Delaney saw Dr. Banga for her diabetes. R. 826-29. Her diabetes was uncontrolled. Dr. Banga increased her insulin dosages. R. 826.

On December 4, 2013, Delaney saw a retina specialist at the Washington University School of Medicine Ophthalmology and Visual Sciences Department. She reported "smudgy vision with floating lines since September 2013. Her corrected vision was 20/40 in the right and 20/60 in the left. R. 688. On December 12, 2013, ophthalmologist Dr. Chin Yee, M.D., performed a Panretinal Photocoagulation (PRP) on Delaney to

limit the effects of diabetic retinopathy. The procedure involved burning parts of the retina with lasers. R. 696. Dr. Yee repeated the PRP procedure on December 19, 2013 and January 2, 2014. R. 694-95.

On February 20, 2014, Delaney returned to Washington University for intravitreal injections. At that time, her corrected visual acuity was 20/50 in the right eye and 20/60 in the left. R. 693. On March 26, 2014, Delaney went to Washington University for intravitreal injections. At that time, her corrected visual acuity was 20/50 in the right eye and 20/60 in the left. R. 692.

On April 9, 2014, Delaney saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination. R. 698-701. Dr. Chapa noted that Delaney had documented diabetic retinopathy in both eyes. Delaney's corrected visual acuity was 20/50 in the right eye with pinhole acuity of 20/70, and 20/70 in the left eye with pinhole acuity of 20/70. Her visual fields were normal on gross confrontation. R. 698.

On April 10, 2014, Delaney saw state agency psychologist Dr. Dolores Trello, Psy.D., for a mental status examination. R. 704-08. Delaney reported that she had social anxiety all of her life. She said she felt anxious around people. Delaney also reported that she was depressed. She said she went through depression after her miscarriage in

June 2013.  She reported having trouble sleeping. She took Benadryl over-the-counter to help her sleep, but did not take any other medication for her mental condition.  R. 705.

Delaney reported that she had two friends and a boyfriend.  She said that she went to a lake often and liked to sit around a fire.  She said that she liked to draw and make jewelry.  She said she depended on her parents for emotional support.  Delaney said that she could cook, do laundry, and perform household chores.  She could drive.  R. 706.

Dr. Trello noted that Delaney's concentration was good.  Her immediate, recent, and remote memory was intact.  Dr. Trello assessed major depressive disorder, recurrent of moderate severity, social anxiety, panic attacks without agoraphobia, and generalized anxiety disorder.  R. 707.

On May 19, 2014, Delaney saw state agency optometrist Dr. Chelsey Moore, O.D., for a consultative eye examination.  R. 711-15.  She reported receiving injections in her eyes to help with the diabetic macular edema. She reported that she was forced to quit work due to vision decline.  R. 711.  On examination, Delaney had corrected visual acuity of 20/30 in the right eye and 20/40 in the left, with no pinhole improvement.  R. 712.  Delaney's confrontation visual fields were full.  She had no cataracts.  The

fundoscopic examination showed scars on the retina from the PRP treatments. Visual field testing showed mild superior defect in the right eye and moderate superior defect in the left, attributed to the PRP treatments. Dr. Moore concluded that Delaney had "a couple of areas of mild decreased visual field areas, but would not hinder Claimant in activities of daily living." R. 713.

Dr. Moore assessed proliferative diabetic retinopathy post PRP treatments "to prevent retinal tears/breaks/detachments in future," and a history of macular retinal edema treated with injections to prevent further vision damage. Dr. Moore opined that Delaney was at great risk of losing her vision due to her uncontrolled diabetes. Dr. Moore recommended continuing to follow care instructions from the Washington University physicians, driving only during the daytime in familiar locations, continue wearing glasses, but not contact lenses. Dr. Moore also opined that, "a hand held magnifying glass may help near vision." R. 713.

On May 29, 2014, state agency physician Dr. Charles Kenney, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 121-23. Dr. Kinney opined that Delaney had no physical functional limitations. Dr. Kenney opined that Delaney's visual limitations would not affect her ability to work. R. 122.

Delaney continued to have monthly injections in her eyes from May 2014 through January 2016.  R. 850-51, 853, 855, 857, 863-869, 875, 924-28.

On February 26, 2015, Delaney saw state agency physician Dr. Hima Atluri, M.D., for consultative examination.  R. 845-49.  Delaney reported that she was following her diabetic regimen and, "[s]ince almost 2011 to now" she has had "no diabetic ketoacidosis, and no hypoglycemic reactions."  R. 845.  On examination, her corrected visual acuity was 20/50 in the right eye and 20/40 in the left, both with or without pinhole.  R. 847.

On March 4, 2015, her corrected visual acuity was 20/50 in the right eye and 20/60 in the left.  R. 851.

On March 16, 2015, Delaney saw state agency psychologist, Dr. Stephen Vincent, Ph.D., for a mental status examination.  R. 888-91.  Delaney reported, "[S]he has tried to work as a cashier at Dollar General, but stopped secondary to a history of interacting with co-workers and supervisors, as well as episodes of sudden onset of intense fear and panic episodes related to interacting with the general public."  R. 888.  She reported having anxiety when she had to leave her home.  She was prescribed clonazepam for the anxiety.  She took the medication when she knew she was leaving her home.  She said she had "episodes of sudden

onset of intense fear, particularly when she is outside of her 'comfort zone,' with symptoms that include fear of losing control, dizziness and lightheadedness, chest pain, discomfort, shortness of breath, tightness around her throat, trembling and shaking and episodes of accelerated heart rate." R. 888-89. She reported that she lived with her boyfriend. She also reported that she liked to paint, read, and care for her dog, "which she finds therapeutic." R. 889. Dr. Vincent assessed generalized anxiety disorder; panic disorder, with agoraphobic features; and social anxiety disorder. Dr. Vincent stated that cognitively, she was intact. R. 891.

On April 2, 2015, state agency physician Dr. James Hinchen, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 139-42. Dr. Hinchen opined that Delaney could frequently lift ten pounds and occasionally lift 20 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ropes, ladders, and scaffolds; and occasionally balance. Dr. Hinchen also opined that Delaney should avoid concentrated exposures to vibration and hazards. Dr. Hinchen opined that Delaney was not functionally limited by her impaired vision. R. 140-41.

On April 29, 2015, Delaney went to see endocrinologist Dr. Anju Gurung, M.D., for uncontrolled type 1 diabetes. Delaney reported that she

missed taking her Lantus insulin 1-2 times per week and missed taking her Humalog insulin 1-2 times per day. She also did not eat three meals a day. She often skipped breakfast. She also ate snacks during the day. Her lunches and dinners usually included 60 grams of carbohydrates. Her meter showed blood sugar readings of 232-330 in the mornings, 200s-300s at lunchtime and suppertime, with some readings in 400s-500s when she ate chocolates and cookies. R. 993. Dr. Gurung adjusted her insulin dosages, instructed her to eat three meals a day without snacks, and referred her to a dietician to learn to count carbohydrates. R. 996.

On June 16, 2015, Delaney underwent a consultative examination by optometrist Dr. Ronald Weingart, O.D. R. 894-905. Delaney reported to Dr. Weingart that she regularly bumped into walls and tripped over unseen objects on the floor. She said that she easily lost her balance and periodically fell. She reported that she had to use railings and walls to guide her movement. She said that she held onto friends or family members to walk outside, especially at dusk. R. 894. Delaney reported that she could not read cooking ingredients or recipes. She said she could not tell if a meal was fully cooked. Delaney reported that she lost her cashier job "after a blood vessel burst inside her in 2013 preventing her from being able to read credit card numbers." R. 894.

Dr. Weingart said Delaney had poor depth perception and had lost much of her peripheral vision.  R. 895.  Dr. Weingart opined:

> Ms. Delaney experiences difficulty while walking, reading, reading cooking instructions, and preparing a meal.  She is unable to locate and maintain an occupation, as well as, perform many other Activities of Daily Living (ADL).

R. 895.

On examination, Delaney's corrected visual acuity was 20/50 in both eyes for distance and 20/30 for near vision.  Her visual acuity diminished in low light situations, such as dawn and dusk.  She had some color-blindness.  She had difficulty working both eyes together (binocular function).  She could not "effectively track moving targets."  Dr. Weingart said this problem was consistent with peripheral vision loss due to PRP.  Dr. Weingart said poor binocular vision was "consistent with her symptoms of dizziness, disorientation, and poor depth perception."  R 896.  Testing also showed a midline shift—Delaney perceived a straight line in front to be on her left side.  Dr. Weingart said this was consistent with loss of balance.  R. 896-97.

Field of vision testing showed "a significant loss of sensitivity in Both Eyes in the Peripheral Visual Field."  Dr. Weingart found that Delaney lost "clinically significant" amounts of peripheral vision, which affected balance, fusion of central vision, and a person's sense of location in space.  Dr.

Weingart said the loss of visual field was consistent with dizziness, falling down, and tripping. He said the loss of field of vision explained why she used a wall as a guide to walk. R. 897.

A Visually Evoked Potential test showed "a reduction in the magnitude of information reaching the Visual Cortex and this information is delayed." Dr. Weingart said the reduced Visually Evoked Potential "significantly impacts Ms. Delaney's ability to discriminate small text, as well as, move through space." R. 898. Dr. Weingart also stated that the quality of Delaney's vision changed dramatically each day due to fluctuations in her blood sugar levels. R898. Dr. Weingart referred Delaney to her medical and visual treating professionals for treatment. R. 899.

On July 8, 2015, Delaney saw Dr. Gurung for a follow up on her diabetes. R. 999-1004. Delaney reported poor compliance with insulin and diet instructions. Delaney reported that she did not pay attention to carbohydrate amounts in her meals. Dr. Gurung said it was not clear that Delaney could count carbohydrate intake accurately. Delaney's meter download showed blood sugar readings from 53 to 445, "which is related with poor carb counting." R. 1000. Dr. Gurung said her that her failure to maintain her insulin dosage regimen made it "quite hard to assess her glycemic profile." Dr. Gurung said Delaney was interested in an insulin

pump, but she needed to count carbs effectively first.  R. 1002.  Dr. Gurung

adjusted her medications and had her keep a two-week log of her blood

sugar readings.  R. 1002.  From July 16, 2015 to July 29, 2015, Delaney

kept a log of her blood sugar values.  Her blood sugar varied from 76 to

457.  R. 910.

On March 2, 2016, Delaney saw Dr. Michael Jakoby, M.D. for a follow

up on her diabetes.  R. 1006-10.  Dr. Jakoby found that her diabetes was

uncontrolled "secondary to inconsistent carbohydrate

consumption/sedentary lifestyle."  Delaney stated she was interested in an

insulin pump.  Dr. Jakoby stated that she needed "better glycemic control

and good CHO counting skills before considering insulin pump."   Dr.

Jakoby adjusted her insulin dosages and referred her to a dietician.  R.

1009.

## EVIDENTIARY HEARINGS

### July 7, 2016 Hearing

On July 7, 2016, the Administrative Law Judge (ALJ) conducted an

evidentiary hearing.  R. 75-101.  Delaney appeared with her attorney.  An

independent medical expert, Dr. Bruce Biller, M.D., testified at the hearing.

Dr. Biller was a specialist in internal medicine and endocrinology.  He has

been an independent medical expert for the Social Security Administration

since 1978.  R. 79.  The ALJ had not discussed the case with Dr. Biller

before the hearing.  Dr. Biller reviewed the medical evidence in the record,

but did not examine Delaney.  R. 80.

Dr. Biller opined that Delaney's physical condition did not meet  or

equal the requirements of any physical condition listed in the Social

Security Administration's Listing of Impairments, 20 C.F.R. Part 4040,

Subpart P, Appendix 1  (Listings).  R. 85, 90.  Dr. Biller did not opine on

Delaney's mental condition.  R. 87.

Dr. Biller further opined:

I felt the record after May 1, 2012, does not show significant
physical limitation . . .

. . . .

[i]n activities of daily living both self-care and doing usual things
people do, she had the ability to for example, playing cards with
her family and doing various physical activities around the
house regularly.

. . . .
I felt the record did not show significant physical limitations.

R. 90-91.

Dr. Biller opined the following concerning Delaney's vision:

The limitation I saw was you would want to protect the eyes
from extremes to prevent harm. So this would not be someone
who should be working in a dusty environment or an
environment where a splash might occur from chemical, etc.
. . . .

But in terms of office work, I didn't see that there would be a problem, and I believe her prior work at Dollar General was office work.

R. 92.

The ALJ asked Dr. Biller about Dr. Weingart's opinions. Dr. Biller dismissed Dr. Weingart's statements that Delaney could not read recipes or credit card numbers. Dr. Biller said those claims were just recitations of Delaney's statements. Dr. Biller relied on the tests that showed her vision was corrected to 20/30 to 20/50 range. He also noted that doctors recommended use of a magnifying glass to read small print. Dr. Biller said that many people use magnifying glasses for this purpose. R. 96. Dr. Biller concluded that her visual impairment would not preclude her from working:

I didn't see that the degree of loss would impair her from the type of work that she has been doing previously in terms of office work and there may need to be an accommodation such as the magnifier, but I didn't see that the visual field issue was significant enough and furthermore, I can point out that she was driving and there was no evidence that she could not drive during the day despite some diminishment in visual field.

R. 97. Dr. Biller also stated that Delaney's depth perception deficits were not a problem. Dr. Biller opined that Delaney's ability to draw and paint indicated that her depth perception deficits would not limit her ability to perform office work. R. 97.

Dr. Biller further stated that Delaney's retinopathy was not progressive. He said that if she was compliant with her diabetes regimen, her vision should not deteriorate further. R. 97-99.

The ALJ concluded the hearing due to a lack of time. He said he would set another hearing to hear additional evidence. R. 99-101.

October 27, 2016 Hearing

The ALJ conducted a second hearing on October 27, 2016. R. 38-74. Delaney appeared with her attorney. Vocational expert Bob Hammond also appeared at the hearing. R. 38. Delaney testified first.

Delaney testified that she lived with her boyfriend in a one-level residence. She completed about two years of college course work. She indicated she did not secure a degree because she was sick often. R. 43-44. Delaney did not drive often, although she had a driver's license. She did not drive at night. R. 43.

Delaney last worked in June 2012. She was a cashier at a Dollar General store. She said she had to stop working because of her eyesight. She indicated that she was not able to read credit cards and the screens on the cash register machines. R. 45-46. Delaney noted that she could see well enough to drive during the daytime, but she could not see well enough to read or to make out facial features if a person was far away. She

testified that she was able to see "signs and stoplights." R. 46. She said she could recognize the color and shape of street signs like stop signs and she could recognize the color of stoplights. R. 62-63. She drove mainly in her hometown because she was familiar with the streets. She had someone else drive if she went out of town. R. 63.

She said she could read bills if she brought them close to her face. She also had her boyfriend read bills to her. She stated she could read a tablet screen because she could enlarge the print. R. 46-47, 51.

Delaney indicated her boyfriend drove a semi-tractor trailer. He was gone during the week and home on weekends. Delaney said she lived alone during the week. She got help during the week from her mother or neighbors. She said her mother lived across the alleyway. R. 47. Her mother helped her cook, read mail, or run errands. R. 59. Delaney, however, testified that she could take care of herself for the most part. She could take care of her personal hygiene and could dress herself. R. 47-48.

Delaney said she did housework and laundry. R. 49. She testified that once when doing laundry she mistook a mouse for a sock. She picked up the mouse by mistake. R. 59. She said she went grocery shopping if her anxiety was not too high. She went to smaller stores sometimes because of her anxiety. She said her parents owned "lake lots" so she sat

around a fire near a lake "a lot of the time." R. 49.  She testified that when she went camping, her boyfriend "is usually my feet and eyes."  She said she usually hung on to him and he showed her where to go to get to the campsite.  R. 73.

Delaney said she also hung out with friends, although she said she had not done that for about three months.  R. 61.

Delaney indicated that she washed dishes.  Often, however, she did not get the dishes clean.  Her boyfriend often put the dishes back into the sink because they were not clean.  R. 52.

Delaney said she used the microwave oven to prepare meals.  She also cooked on the stove or in a conventional oven when her boyfriend was there.  She said he checked to see whether meat was done.  R. 52.

Delaney said she used to like to draw, paint, and make jewelry, but not anymore.  She said she could not because of her eyesight.  She testified that she had not engaged in any drawing, painting, or jewelry making for three years.  R. 50.  Delaney said she sat very close to the television when she watched it.  She said she sat about three feet from her 60-inch television.  R. 51.

Delaney said she avoided being on her feet.  She testified that she was on her feet when she participated in a charity walk for the Juvenile

Diabetes Research Foundation.  She said she had to stay off her feet for

"the next couple days" after because "they were on fire."  R. 61.  Delaney

only walked about a block or two during the charity walk.  R. 62.

Delaney testified that she no longer received injections in her eyes

because her insurance did not cover the doctors at Washington University

eye center any more.  She said she has not attempted to find a new doctor

to give her the shots.  R. 53.

Vocational expert Hammond then testified.  The ALJ asked

Hammond the following hypothetical question:

> Assume the past work activity the same as the claimant 's,
> exertional capacity limited to light work, no climbing of ladders,
> ropes, or scaffolds, other postural functions performed
> occasionally, need to avoid environmental hazards, need to
> avoid concentrated exposure to extreme temperatures, to
> pulmonary irritants, and to vibrations. Also, a limitation to
> performance of unskilled work that could be detailed but would
> be really involved but would only involve a few concrete
> variables, occasional interaction with the public, co-workers,
> and supervisors, and also the need to receive any work-related
> instructions either orally or by demonstration. How would the
> past work be affected by those limitations?

R. 64-65.  Hammond opined that such a person could not perform

Delaney's past relevant work.  R. 65.

Hammond opined that such a person could perform other work

including:  bench assembly, with 2,800 such jobs in Illinois and 136,000

nationally; assembler II, with 2,500 jobs in Illinois, and 131,000 nationally;

and injection molder with 1,700 such jobs in Illinois, and 121,000 nationally. Hammond said these three were representative of the type of jobs the person could perform.  R. 65.

Hammond also said that according to the U.S. Department of Labor's Dictionary of Occupational Titles (DOT), the person could perform the job of housekeeper maid, with 2,700 such jobs in Illinois, and 133,000 nationally.  Hammond, however, disagreed with the DOT on this point.  He opined that the person could not perform this type of job.  R. 66.

Hammond opined that the person would have no problem using a magnifying glass while performing the two assembly jobs.  However, the number of bench assembly positions would be reduced by approximately 50 percent.  He said that the person could set up the magnifying glass on a stand at her work area.  Hammond testified that he has seen some employers provide magnifying glasses for these types of jobs.  R. 67-69.

Hammond opined that a person would have a difficult time using a magnifying glass while performing the injection molder and housekeeper maid jobs. He opined that these two jobs were "hand intensive" and using a magnifying glass "would interfere with persistency and pace of those two positions."  R. 67-68.  Hammond, however, stated that a person in these

two assembly jobs would be allowed to bring a magnifying glass to use at work.  R. 68-69.

<h1 style="text-align:center">THE DECISION OF THE ALJ</h1>

The ALJ issued his decision on December 29, 2016.  R. 15-30.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the Listings in 20 C.F.R. Part 404 Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that she met her burden at Steps 1 and 2. Delaney had not engaged in substantial gainful activity since May 1, 2012, and she suffered from the severe impairments of diabetic neuropathy, diabetic retinopathy, affective disorder, and anxiety.  R. 17.  The ALJ determined at Step 3 that Delaney's impairments or combination of impairments did not meet or medically equal any Listing.  R. 18.  The Listings related to eyesight required corrected visual acuity of 20/200 or less, a contracted visual field of 20 degrees or less, or a visual efficiency percentage of 20 or less.  Listings 2.02, 2.03, and 2.04.  The ALJ said the

medical evidence showed corrected visual acuity ranging 20/40 to 20/60, and no medical evidence showed either the required contraction of visual field or the required visual efficiency percentage. R. 18.[1]

At Step 4, the ALJ found that Delaney had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant may not climb ladders, ropes, or scaffolds; the claimant can perform other postural functions occasionally; the claimant must avoid workplace hazards, the claimant must avoid concentrated exposure to extreme temperatures, pulmonary irritants, and vibrations; the claimant needs the opportunity to use a magnifying glass if desired; the claimant is limited to the performance of unskilled work that can be detailed but that involves few concrete variables, occasional interaction with the public, coworkers, and supervisors, and the need to receive any work-related instructions either orally or by visual demonstration.

R. 20. The ALJ relied on the records that showed Delaney's visual acuity was corrected to 20/40 to 20/60, and on Dr. Biller's opinions that she could perform office work based on his review of the medical records. The ALJ also relied on evidence that Delaney had sufficient functional visual capability because she continued to drive, draw, and paint. She also was able to live alone during the week while her boyfriend was working as a

---

[1] Dr. Weingart tested for visual field but did not find a specific percentage of contraction. He also tested for visually evoked potential, but did not test for visual efficiency percentage. To the extent the visually evoked potential is the same as visual efficiency percentage, Dr. Weingart did not find a particular percentage. R. 897-99.

truck driver.  The ALJ also noted that Delaney told Dr. Vincent that she stopped working because of her fear of interacting with the public, not her vision problems.  The ALJ noted that "the medical expert and consultative examiner both stated" that she needed to use a magnifying glass.  R. 26. The ALJ noted that Dr. Moore O.D. opined that Delaney "use a magnifying glass as needed."  R. 24, 713.

The ALJ stated that he gave great weight to Dr. Biller's opinions.  The ALJ also relied on Dr. Moore's consultative examination.  The ALJ discounted Dr. Weingart's opinions.  The ALJ said most of Dr. Weingart's opinions were based solely on Delaney's subjective reports that she bumped into walls, could not read a cookbook, could not use appliances, and had difficulty with activities of daily living.  The ALJ credited Dr. Weingart's observations that her corrected visual acuity was 20/50 for distance vision and 20/30 for near vision.  The ALJ also gave greater weight to the opinions of Dr. Biller that Delaney's peripheral vision loss would not preclude office work and his observation that Delaney continued to drive.  R. 28.  The ALJ gave limited weight to the opinions of Drs. Kenney and Hinchen.  The ALJ noted that Drs. Kenney and Hinchen did not have all the evidence in the record available to them when they rendered their opinions.  R. 28.

The ALJ also found that Delaney's statements regarding the extent to which her visual limitations affected her ability to function were not entirely consistent with the medical evidence and the other evidence in the record. R. 23. The visual acuity testing was inconsistent with her statements that she could not read credit card numbers. The reduced peripheral vision and depth perception would not preclude office work according to Dr. Biller. Delaney also could live alone during the week. Delaney could paint, draw, and drive. Delaney also told Dr. Vincent that she stopped working because of her fear of interacting with the pubic. The ALJ found that this statement contradicted her other statements that she stopped working because she could not read credit card numbers. R. 26. The ALJ concluded that the evidence as a whole, including her statements, supported the limitations set forth in the ALJ's RFC determination.

After determining Delaney's RFC, the ALJ found at Step 4 that she could not return to her prior relevant work. R. 28. The ALJ determined at Step 5 that Delaney could perform a significant number of jobs that existed in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational expert Hammond. The ALJ credited Hammond's testimony that a person with Delaney's age, education, work experience, and RFC

could perform the representative jobs of bench assembly and assembler II. The ALJ concluded that Delaney was not disabled.  R. 29.

Delaney appealed the ALJ's decision.  On March 2, 2017, Appeals Council denied Delaney's request for review.  The decision of the ALJ then became the final decision of the Commissioner.  R. 1.  Delaney then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. (emphasis added)  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The

Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The majority of the medical evidence regarding her vision, with the exception of Dr. Weingart's opinions, supported the RFC determination.  The ALJ credited Dr. Biller's opinions over Dr. Weingart's.[2]  Both offered expert opinions.   Dr. Biller testified as an independent medical expert, and Dr. Weingart performed a consultative examination.  The Court will not reweigh the evidence offered by these experts.  See Jens, 347 F.3d at 212; Delgado v. Bowen, 782 F.2d at 82.  The ALJ's decision to give limited weight to Delaney's statements about the limitations caused by her retinopathy was supported by: (1) medical evidence other than Dr. Weingart's report, (2) her repeated statements that she liked to paint and draw (and so had the visual ability to do so), (3) her ability to drive in the

---

[2] Delaney erroneously asserts that Dr. Weingart was her treating optometrist. Brief in Support of Plaintiff's Motion for Summary Judgment (d/e 14) (Delaney Brief), at 1.  That statement is clearly wrong.  Dr. Weingart conducted a consultative examination.  Nothing in the record indicates that Dr. Weingart ever treated Delaney.  Neither Dr. Biller nor Dr. Weingart treated Delaney.

daytime, and (4) her statement that she stopped working because of her fears of contact with the public (rather than because of her vision).[3]  The ALJ's decision was supported by substantial evidence.

Delaney argues that the ALJ failed "to build an accurate and logical bridge" from the evidence to his conclusion regarding the functional limitations cause by her limited vision.[4]  Delaney argues that the ALJ erred because he credited Dr. Biller's opinions and tests that consistently showed corrected visual acuity in the 20/40 to 20/60 range rather than Dr. Weingart's opinions.  Delaney essentially asks the Court to reweigh the evidence.  The Court will not do this.  See Jens, 347 F.3d at 212; Delgado v. Bowen, 782 F.2d at 82.  The ALJ's built a logical bridge from the medical evidence that he credited to his conclusion.[5]

Delaney argues that the ALJ improperly evaluated Delaney's statements about the severity of her symptoms.  An ALJ must evaluate

---

[3] Delaney testified at her hearing on October 27, 2016, that she stopped painting and drawing three years earlier.  R. 50.  Other evidence indicated that she did not stop these activities.  She told Dr. Trello in 2014 that she liked to draw and make jewelry, and she told Dr. Vincent in 2015 that she liked to paint.  R. 706 and 889.  In light of these inconsistent statements, the ALJ could find that she still drew and painted.

[4] Delaney makes a passing assertion that the ALJ erred at Step 3 in finding that her condition did not meet or equal a Listing.  Delaney Brief, at 7.  Delaney also made a passing mention of the ALJ's findings at Step 3 that she had mild restrictions on daily living and moderate difficulties with maintaining social functioning and concentration, persistence or pace.  Delaney Brief, at 15.  Delaney, however, did not develop an argument regarding the ALJ's analysis at Step 3 and, as such, any such argument is waived.  See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

[5] Delaney also criticized the ALJ for not discussing the fact that she had "pinhole vision."  See e.g., Delaney Brief, at 13.  No medical professional diagnosed her with pinhole vision.  Some used a pinhole to test her visual acuity.  See e.g., R. 699 (Dr. Chapa's examination), R. 712 (Dr. Moore's consultative examination).  None diagnosed her with "pinhole vision."

statements regarding the intensity, persistence, and limiting effects of her symptoms in light of all of the evidence in the record, including the medical evidence. SSR 16-3p, 2016 WL 1119029 at *3 (March16, 2016). The ALJ "must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings in the record." SSR 16-3p, 2016 WL 1119029 at *4 (March16, 2016). When objective medical test results are not consistent with the individual's statement about his symptoms, the objective medical evidence "may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with the other evidence in the record." SSR 16-3p, 2016 WL 1119029 at *5. In this case, the ALJ found that the medical evidence and the other evidence in the record were less supportive of Delaney's claims about the limiting effects of her vision. The ALJ's explanation of the ALJ's evaluation of her statements was supported by evidence in the record. The Court will not revisit them. See Pepper, 712 F.3d at 367. There was no error.

Delaney argues that the ALJ improperly decided that she could work based on her report of her daily activities. She argues that the ALJ ignored the fact that she performed these activities with difficulty. The ALJ,

however, did not find that Delaney could work based solely on her reports of daily activities.  The ALJ found that she was not disabled based on all of the evidence in the record.  The ALJ relied on the medical evidence, Delaney's statements to Dr. Vincent that she stopped working for a reason other than eyesight, her reports of daily activities, the testimony of vocational expert Hammond, and the Medical-Vocational Guidelines.  The regulations require an ALJ to consider daily activities in evaluating the effect of a claimant's symptoms on her ability to function along with other evidence.  20 C.F.R. § 404.1529(c)(3)(i).  The cases cited by Delaney involved situations in which the ALJ relied solely on only a claimant's daily activities to prove that she was not disabled or equated household chores with competitive work.  See Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005).  The ALJ did not commit this error.

Delaney argues that the ALJ erred by failing to consider how the use of a magnifying glass would affect her ability to perform the representative jobs of bench assembly and assembler II.  Delaney cites a case in which an ALJ did not consider the impact of the claimant's vision on his ability to work.  Beamon v. Astrue, 2012 WL 871096, at *9-10 (N.D. Ill. March 13, 2012).  The claimant in Beamon used a magnifying glass to read.  Here, the ALJ considered extensive evidence on the impact of Delaney's vision

on her ability to work. Furthermore, Hammond testified that a person could perform the bench assembly and assembler II two jobs with a magnifying glass and he knew of employers that provided magnifying glasses to employees who performed these jobs. The <u>Beamon</u> case does not apply.

Delaney also argues that the ALJ erred in relying on Dr. Moore's opinion that a handheld magnifying glass may help near vision. She argues that the ALJ should have given more weight to Dr. Weingart's opinions. <u>Delaney Brief</u>, at 22. The Court, again, will not reweigh the evidence. Dr. Moore's opinion supported the ALJ's determination that Delaney's RFC included the ability to use a magnifying glass. Hammond's opinions supported the ALJ's finding that she could use a magnifying glass to perform the bench assembly and assembler II jobs. There was no error.

Delaney argues that the ALJ erred by not letting Hammond testify about how the use of a magnifying glass affected a person's efficiency in performing work. Hammond stated that a handheld magnifying glass would limit a person's persistency and pace in performing the housekeeper maid and injection molder jobs. The ALJ stopped Hammond and asked him to address only whether a person could use a magnifying glass in those jobs. R. 68-69. Hammond indicated that the injection molder position and the housekeeper maid position would be effected by the use of a magnifying

glass. However, the assembler II position would still be qualified and the use of a magnifying glass would not be an issue in either of the two assembly positions. Any possible error in stopping Hammond's testimony on this point was harmless. The ALJ did not find that Delaney could perform either the housekeeper maid jobs or injection molder jobs. The ALJ only found that she could perform the representative jobs of bench assembly and assembler II. Hammond testified that use of a magnifying glass would not affect her ability to perform all of the assembler II jobs and 50 percent of the bench assembly jobs. The discussion about job efficiency only related to the housekeeper maid and injection molder jobs, and so, did not affect the outcome.

THEREFORE, IT IS ORDERED THAT Defendant Commissioner's Motion for Summary Affirmance (d/e 16) is ALLOWED, Plaintiff Delaney's Motion for Summary Judgment (d/e 13) is DENIED, and the decision of the Commissioner is AFFIRMED. All pending motions are denied as moot. THIS CASE IS CLOSED.

ENTER: June 13, 2018

_s/ Tom Schanzle-Haskins_
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE